UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAGDISH BAROT,

    Plaintiff,

vs.                                          CASE NO. 6:08-cv-1179-ORL-31DAB

DRS Technologies, Inc.,
formerly doing business under a subsidiary,
DRS SENSORS & TARGETING SYSTEMS, INC,

    Defendant.

_____/

**VERIFIED FIRST AMENDED COMPLAINT;
DEMAND FOR JURY TRIAL**

Comes now Plaintiff, Jagdish Barot, by and through undersigned Counsel, and files this Verified First Amended Complaint; Demand for Jury Trial and states:

**Count I. Contract Discrimination**

**42 U.S.C. § 1981**

1.    Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has subject matter jurisdiction over this action because of the federal civil rights law violations alleged in this Count.

2.    Venue is proper in this Court because the violations of law alleged herein occurred in Brevard County, Florida.

3.    Plaintiff, Jagdish Barot, is a man of color and of Indian ancestry, national origin, and ethnicity (hereinafter referred to collectively and individually as Mr. Barot's "race"); and, who is a United States citizen residing in Brevard County, Florida.

4.  Defendant, DRS Technology, INC,(hereinafter "DRS"), is a foreign corporation with offices in Brevard County, Florida. Upon information and belief, Mr. Barot worked for DRS Sensors & Targeting Systems, Inc., which since has been wholly assimilated into its parent corporation, DRS, as an unincorporated division of DRS. Defendants are referred to herein, individually and collectively, as "DRS."

5.  Mr. Barot worked for DRS from October 1, 2001 until his dismissal on or about May 25, 2006, as a Manufacturing Engineer.

6.  Under Section 1981, Mr. Barot has the right to make and enforce contracts -- which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship -- as is enjoyed by white people.

7.  Because of Mr. Barot's race, DRS intentionally and systematically violated Mr. Barot's rights to make and enforce contracts by subjecting him to racially disparate treatment, severe and pervasive racial harassment, and/or other materially adverse racially motivated employment actions, including the following specific acts and omissions:

   A.  In late 202, Mr. Barot's white manager, DRS's manufacturing engineering manager Phillip Frier, criticized Mr. Barot at Mr. Barot's annual review for his accent and for being of a "different" ethnicity; and, Frier had denied a promotion to a fellow employee, Rupert Hector, due to Hector's accent.

   B.  In 2003, Mr. Barot heard that Frier refer to people of African origin as "niggers." When Mr. Barot alerted HR Manager Robin Reilly (a white woman) of the derogatory speech, Reilly and the then Vice President, a white man named Norman

DesMarais, covered it up; and, rather than viewing Mr. Barot's warning as a concern for the company, they deliberately subjected Mr. Barot to hostile interrogation.

  C. In denying Mr. Barot's request for promotion, Frier told Mr. Barot that he did not think Mr. Barot could be manager of white boys. (On another occasion, Frier directed Mr. Barot to compromise work so that Mr. Barot would not look better than his white colleagues.) Frier also told Mr. Barot that DesMarais thought that white boys would not want to work for Mr. Barot.

  D. At various times during Mr. Barot's employment with DRS and contrary to the way DRS treated Mr. Barot's similarly situated coworkers not of Mr. Barot's race, DRS partially or wholly denied Mr. Barot business cards, a company credit card, a rental car, and a cell phone when required, including when Mr. Barot was send by DRS to California in 2004.

  E. In the summer of 2003 or 2003, Raytheon Engineers came to DRS Optronics to demonstrate the power of Process Model■. Mr. Barot was scheduled to be at the meeting, but Frier told him that he must stay away from the meeting because ■Desmarais did not want Mr. Barot to be where the customer is, as Desmarais felt it will not look good for the company. DRS's discriminatory prohibition of Mr. Barot from the Raytheon meeting induced insomnia for him.

  F. Frier denied Mr. Barot permission to visit a dentist when Mr. Barot returned in October, 2004, from assignment in California, saying that he would fire Mr. Barot if he went to the dentist without completing Mr. Barot's work. The resulting delay

caused physical pain for Mr. Barot and exacerbated his dental problem, resulting in a tooth extraction that probably would not have been otherwise.

G.   Mr. Barot's work was under constant scrutiny by DRS, and even a slight omission or linguistic error was magnified many times.

H.   DesMarais told Mr. Barot that he thought Mr. Barot's culture was different, and because of that he did not think Mr. Barot was qualified to be a manager. DesMarais preached that it did not matter how well you performed at work, or how hard you worked; all that mattered was if your boss liked you.

I.   In February 2005, Dave Zisman, a white DRS manager and Frier's successor as Mr. Barot's immediate supervisor, first met Mr. Barot in Mr. Barot's office, whereupon Zisman was fuming and resentful towards Mr. Barot, and speaking in angry tones towards Mr. Barot, without any reason for his (Zisman's) attitude and conduct except racial animus towards Mr. Barot.

J.   From early 2005 until Mr. Barot's termination in 2006, DRS blamed him for the many serious errors in engineering documentation and other things made by white engineers, including Jim Aiello, Steve Coffie, and Dave Zisman, despite knowing that the white engineers were responsible for the errors.

K.   Drs blamed Mr. Barot for Aiello's work backlog, even though DRS knew that Mr. Barot was not responsible for the backlog. DRS made Mr. Barot the scapegoat for other problems for which DRS knew that Mr. Barot was not responsible.

L.   Zisman designed tools for the Apache Receiver Assembly line, but the tools were grossly inadequate and harmful to the sensitive nature of the task to be

performed. Despite Mr. Barot's objections regarding the harmfulness and inadequacy of the tools, Zisman compelled Mr. Barot to implement the tools in the Process Plan for a subassembly called PODM. The technicians who assembled PODM rejected the tools right away; whereupon, Zisman wrongly and unfairly blamed Mr. Barot for the failure of the tools.

M.   DRS penalized Mr. Barot because he objected to the unlawfully fraudulent and shoddy work practices performed by Henry Travis on at least one of DRS's government contracts. Travis, a white DRS Lead Technician, was not penalized for breaking rules for which DRS penalized Mr. Barot, whether or not DRS knew that Mr. Barot had not broken such rules.

N.   Travis and a DRS manager, Bill Zarzour, insulted Mr. Barot, made ethnic jokes about Mr. Barot, interfered with Mr. Barot's work, and sabotaged Mr. Barot's progress almost every work day.

O.   Zisman, Bill Zarzour, and Travis racially harassed and otherwise discriminated against Mr. Barot in cooperation with each other. Travis was well known by DRS for his racism. He often expressed his dislike, as did Zisman, for Mr. Barot's ethnic accent. Travis and Zarzour, the DRS Production Manager, made many derogatory remarks about Mr. Barot and Mr. Barot's ethnicity in the presence of the customer representative, the technicians on the floor, and Mr. Barot's other colleagues. Both Travis and Zarzour openly expressed their disdain and dislike for Mr. Barot because of Mr. Barot's race/ethnicity -- even including Mr. Barot's food preferences. Zarzour verbally abused Mr. Barot on several occasions and physically threatened Mr. Barot twice.

  P. Whenever Mr. Barot complained of racially motivated harassment, assault, battery, and/or other discrimination to Zisman, Zisman just smiled with satisfaction.

  Q. Zisman and other DRS employees harassed Mr. Barot for poor handwriting, although DRS did not harass similarly situated white employees with the same or worse handwriting.

  R. From August, 2005, until Mr. Barot's termination, Zisman banned Mr. Barot from walking in the hallways at DRS because of Zisman's perception of Mr. Barot's ethnic accent and ethnic looks as being offensive. Zisman told Mr. Barot that because of Mr. Barot's ethnic traits, Mr. Barot did not portray a good image of the department or of the company. Zisman specifically directed Mr. Barot to avoid the hallways where customers might encounter Mr. Barot.

  S. Like Frier before him, Zisman often summoned Mr. Barot to his office to condemn Mr. Barot's ethnic accent, ethnic looks, and other characteristics that Zisman deemed to be ethnic.

  T. After an opportunity for further investigation and discovery, the evidence is likely to show that DesMarais instructed Zisman and other DRS managers to harass and otherwise discriminate against Mr. Barot because of Mr. Barot's race/ethnicity.

  U. Zisman punished Mr. Barot for anyone else feeling discomfort with Mr. Barot's ethnicity.

  V. Zisman harassed and set up Mr. Barot to fail when Zisman essentially admitted to Mr. Barot that because of Mr. Barot's race/ethnicity, Zisman had refused to inform Mr. Barot that a DRS Program Manager requested that Mr. Barot make a

presentation of Process Model■ for simulation of operations sequence for constraint and capacity analysis.

W.  Because of Mr. Barot's race, Zisman did not allow Mr. Barot to share ideas or expertise with Mr. Barot's colleagues at DRS, which effectively penalized Mr. Barot because one of the criteria at the Annual Performance Review is doing things beyond the call of duty.  This discriminatory prohibition was also stated in an email in April or May, 2006, from Brian Bitney, Mr. Barot's Lead at the time.  One case in point involved the Doublet Assembly for the TWS Program.

X.  Because of Zisman's racial animus towards Mr. Barot, Zisman concealed and ignored the reporting system Mr. Barot was required to use by Zisman, to make it appear Mr. Barot was not doing his job, including Mr. Barot's corrections of errors made by Aiello and other engineers.

Y.  On October 18, 2005, because of racial animus towards Mr. Barot, Zisman and Reilly gave Mr. Barot a written reprimand in Reilly's office, based on their lies and evidence they fabricated to the effect that Mr. Barot was not completing tasks.

Z.  Although DRS wrongly reprimanded Mr. Barot regarding the Unique Identification or UID Labels, a similarly situated white colleague was not reprimanded for making mistakes on the labels.  Even worse, DRS wrongly reprimanded Mr. Barot for the white colleague's mistakes, even though Mr. Barot had pointed out the error and saved DRS from embarrassment with DRS customers.

AA.     DRS wrongly reprimanded Mr. Barot for not completing certain tooling, even though DRS knew from an email and the established reporting system that the tooling had been timely completed a week before the date of the reprimand.

BB.     In October, 2005, DRS wrongly reprimanded Mr. Barot regarding filling out a standardized form and attaching an Attachment of Rework Plan, even though DRS knew that Mr. Barot had performed the task properly.

CC.     On October 24, 2005, Mr. Barot reported DRS's racial/ethnic discrimination to Todd Stirtzinger, the Executive Vice President of DRS Optronics.

DD.     Around the end of November, 2005, Zisman summoned Mr. Barot to his office and told Mr. Barot not to apply for the position of Senior Industrial Engineer that DRS was going to post on DRS's website because, as stated by Zisman, he did not like Mr. Barot's ethnic accent, Mr. Barot would not look good if Mr. Barot were required to make presentations, and Mr. Barot would not portray a good image of the department or of the company due to of Mr. Barot's ethnicity.

EE.     Mr. Barot applied for the position of Senior Industrial Engineer at the beginning of December 2005. Within a few minutes, DRS sent an electronic response rejecting Mr. Barot's application.

FF.     IN late 2005, DRS's racial discrimination drastically affected Mr. Barot's health, including hypertension and migraines. Mr. Barot showed the data of the hypertension to Reilly, and told her that Zisman was racially discriminating against him, and it was unlawful for DRS to deny Mr. Barot an equal opportunity for advancement based on his ethnic traits such as accent and looks.

GG. On or about August, 2005, Zisman transferred Mr. Barot to the second shift, saying that he did not want Mr. Barot to go to the daytime meetings because he thought that Mr. Barot would not portray a good image of the department.

HH. Soon after beginning work on the second shift, DRS required Mr. Barot to work Saturdays and Sundays, to work many extra hours, and to perform two jobs for the price of one. More specifically, DRS required Mr. Barot to perform an Industrial Engineering job and a Manufacturing Engineering job, without commensurate pay, promotion, or recognition.

II. While Mr. Barot was working on the second shift, DRS deliberately increased his ostracism and isolation from the information exchanges and actions of his department. Zisman, Zarzour, and Travis exploited DRS's isolation of Mr. Barot to set Mr. Barot up for discriminatorily pretextual reprimands.

JJ. On or about October, 2005, some tools and fixtures Mr. Barot designed and had fabricated at the DRS machine shop were delivered to the production area during the day shift in Mr. Barot's absence, whereupon Travis and Zarzour deliberately hid the tools and fixtures in a cabinet. When Mr. Barot learnt where they were hidden and attempted to access them for requisite validation. he was verbally abused, physically threatened, shoved, kneed in his back, and had a door slammed on his arm by Zarzour in the presence of colleagues.

KK. Mr. Barot complained to Zisman of the conduct, but to no avail. Later, Mr. Barot discovered that Zisman and Travis had conceived the plan to impede Mr.

Barot's work by hiding the tools, thereby creating a pretext for Travis to complain to Zisman and to the other managers about lack of tools. DRS then blamed Mr. Barot for the delay, even though DRS knew that Mr. Barot was not responsible for the delay.

LL. DRS always gave credence to white people over Mr. Barot, even though objective data and logic indicated that the white people were false or erroneous.

MM. Zisman refused to extend support to Mr. Barot when Mr. Barot requested it. When Mr. Barot complained to Zisman about other managers or supervisors subjecting Mr. Barot to verbal abuse or violent outbursts (which Zarzour did repeatedly) to intimidate Mr. Barot and to hamper Mr. Barot's work, Zisman displayed a smile of satisfaction, and Zisman neither took actions to help Mr. Barot nor expressed any concern to Mr. Barot.

NN. DRS deliberately and wrongly based Mr. Barot's annual performance review in May 2006 on incidents occurring after the time period ostensibly covered by the review.

OO. Zisman ordered Mr. Barot to compile a tool list for TWS Program in an impossibly short period of time, then rejected all of the versions produced by Mr. Barot as a pretext to fire Mr. Barot.

PP On May 24, 2006, DRS's HR Director and DRS's HR Manager suspended Mr. Barot after they unsuccessfully attempted to frame him for falsifying time records and for committing other violations of law, rules, and/or regulations.

QQ. On May 25, 2006, DRS fired Mr. Barot without cause.

8.   By discriminating against Mr. Barot because of his race, DRS was acting with malice or callous indifference to Mr. Barot's federally protected rights.

9.   Mr. Barot has been injured by DRS as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

10.  Except for reinstatement, Mr. Barot demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and attorney fees as provided by 42 U.S.C. § 1988.

## Count II. Dissimilar Punishment, Pains, and Other Exactions

### 42 U.S.C. § 1981

11.  Mr. Barot realleges Paragraphs 1 through 5, and states additionally or alternatively:

12.  Under Section 1981, Mr. Barot has the right to be subject to punishment, pains, penalties, and exactions of every kind like those to which white people are subjected, and to no other.

13.  By committing those acts and omissions as alleged in 7A through 7QQ, DRS subjected Mr. Barot to punishment, pains, penalties, and exactions of kinds to which DRS did not subject similarly situated white people;  and, DRS did so because of Mr. Barot's race.

14.  In discriminating against Mr. Barot because of his race, DRS acted with malice or callous indifference to Mr. Barot's federally protected rights.

15.     Mr. Barot has been injured by DRS as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

16.     Except for reinstatement, Mr. Barot demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and attorney fees as provided by 42 U.S.C. § 1988.

## COUNT III. Retaliation

## Make and Enforce Contracts Clause

## 42 U.S.C. § 1981

17.     Mr. Barot realleges Paragraphs 1 through 8 and 12 through 14; and, states additionally or alternatively:

18.     Mr. Barot complained to DRS management about racial discrimination, and about materially adverse actions for complaining of the racial discrimination, perpetrated against him by DRS.

19.     Mr. Barot's complaints of discrimination and retaliation comprised protected activity under the Make and Enforce Contracts clause of 42 U.S.C. § 1981.

20.     DRS took even more and harsher adverse employment actions against Mr. Barot; e.g., Mr. Barot's supervisors withdrew more support and resources, falsely and maliciously lowered his scores on his evaluations, subjected him to even closer scrutiny and surreptitiously monitored him, treated him with even more ostracism, hostility, and disrespect, and fired him; in retaliation for making those complaints.

21. A reasonable employee would have found DRS's retaliatory actions against Mr. Barot to be materially adverse, as Mr. Barot always has found; and, DRS's retaliatory actions against him could well dissuade a reasonable employee from protected conduct.

22. By retaliating against Mr. Barot, DRS denied Mr. Barot the same right to make and enforce employment contracts -- which includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship -- as is enjoyed by white people.

23. In retaliating against Mr. Barot, DRS acted with malice or callous indifference to Mr. Barot's federally protected rights.

24. Mr. Barot has been injured by DRS as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

25. Except for reinstatement, Mr. Barot demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and attorney fees as provided by 42 U.S.C. § 1988.

## COUNT IV. Retaliation

## Like Punishment Clause

### 42 U.S.C. § 1981

26. Mr. Barot realleges Paragraphs 1 through 8 and 12 through 14; and, states additionally or alternatively:

27. Mr. Barot's complaints comprised protected activity under the Like Pains and Punishment clause of 42 U.S.C. § 1981.

28. By retaliating against Mr. Barot, DRS is subjecting Mr. Barot to punishment, pains, penalties, and exactions of kinds to which DRS does not subject similarly situated white people; and, DRS did so because of Mr. Barot's protected activity.

29. DRS took even more and harsher adverse employment actions against Mr. Barot; e.g., Mr. Barot's supervisors withdrew more support and resources, falsely and maliciously lowered his scores on his evaluations, subjected him to even closer scrutiny and surreptitiously monitored him, treated him with even more ostracism, hostility, and disrespect, and fired him; in retaliation for making those complaints; and, a reasonable employee would have found DRS's retaliatory actions against Mr. Barot materially adverse, as Mr. Barot always has found; and, DRS's retaliatory actions against him could well dissuade a reasonable employee from protected conduct.

30. By retaliating against Mr. Barot, DRS denied Mr. Barot the same right to be subject to punishment, pains, penalties, and exactions of kinds as to which white people are subjected.

31. In retaliating against Mr. Barot, DRS acted with malice or callous indifference to Mr. Barot's federally protected rights.

32. Mr. Barot has been injured by DRS as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

33. Except for reinstatement, Mr. Barot demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and attorney fees as provided by 42 U.S.C. § 1988.

## COUNT V. Whistleblower Retaliation

### Florida Whistleblower Act

### Fla. Stat. § 448.101, et seq.

34. Mr. Barot realleges Paragraphs 1 through 8 and 12 through 14; and, states additionally or alternatively:

35. As this Court has original jurisdiction over this civil action, this court has supplemental jurisdiction under 28 u.s.c. § 1367 over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

36. Mr. Barot objected to DRS about the unlawful racial discrimination and retaliation being perpetrated by DRS against himself.

37. Mr. Barot objected to DRS about the fraud, substandard practices, and substandard products that DRS was foisting on the United States government under government contract.

38. In violation of Florida Statute § 448.102(3), DRS took adverse employment action against Mr. Barot; e.g., Mr. Barot's supervisors withdrew more support and resources, falsely and maliciously lowered his scores on his evaluations, subjected him to even closer scrutiny and surreptitiously monitored him, treated him with even more ostracism, hostility, and disrespect, and fired him; because he Objected to the activities, policies, and practices of DRS which are in violation of laws, rules, and regulations; e.g., Section 1981, Title VII, the Florida Civil Rights Act of 1992, anti-fraud statutes, and the common law.

39. DRS acted with malice or callous indifference to Mr. Barot's rights in taking the adverse employment actions against him as alleged in this Count.

40. Mr. Barot has been injured by DRS as a result of the violations as alleged in this Count, including pain and suffering, emotional distress, mental anguish, loss of the capacity to enjoy life, loss of sense of self-efficacy, and economic damages.

41. Except for reinstatement, Mr. Barot demands all relief that is just and equitable, including compensatory damages, punitive damages, costs, and attorney fees as provided by the Florida Whistleblower Act, particularly § 448.104.

### COUNT VI. Negligent Infliction of Emotional Distress

42. Mr. Barot realleges Paragraphs 1 through 5, 7A through 7QQ, and 35; and, states additionally or alternatively:

43. At all times while Mr. Barot was employed by DRS, DRS had a duty to prevent its employees from wrongly impacting and negligently inflicting emotional distress on Mr. Barot and its other employees.

44. DRS breached that duty to Mr. Barot, including the physical impact and injury regarding the dental pain (Paragraph 7F) and the battery (Paragraph 7JJ).

45. DRS's breach of that duty was the proximate and foreseeable cause of the physical injury and the other injuries consequent and incidental to the physical impact to Mr. Barot.

46. As a result of DRS's breach of its duty to Mr. Barot, Mr. Barot was injured and suffered damages, including (but not limited to) pain and suffering from the physical injury, emotional distress and mental anguish arising from the physical injury and impact, and economic damages.

47.     DRS's negligence was gross, willful, wanton, and in callous disregard of Mr. Barot's health, safety, and rights.

48.     Mr. Barot requests all relief that is just and equitable, including compensatory and punitive damages, and the costs of this action.

### Demand for Jury Trial

Mr. Barot demands trial by jury on all issues so triable.

### Verification

Pursuant to Florida Statute S 92.525 and under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and correct.

Signed and Dated this 1st day of October, 2008, by:

*Jagdish S. Barot*
Jagdish Barot

10/01/08

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of October, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Andrew Hament, Att'y, FORD & HARRISON LLP, 1901 South Harbor City Blvd., Suite 501, Melbourne, FL 32901.

Respectfully submitted by:

s/ Mark E. Tietig
Mark E. Tietig, Trial Counsel
Fla. Bar No. 105465
Tietig & Tietig, P.A.
6065 South Tropical Trail
Merritt Island, FL 32952
(321) 452-9944
Facsimile: (321) 452-8942
mt@tietig.com
Attorney for Plaintiff Jagdish Barot